Alright, our next case for this morning is Cook v. Foster. Mr. Ryder Longmade May it please the court, nine years ago, the trial judge who presided over Mr. Cook's criminal trial and post-conviction hearing determined that Mr. Cook could not receive the assistance of counsel that the Sixth Amendment guarantees. In fact, he couldn't recall seeing such a serious combination of errors in 20 years on the bench. And these errors shook his confidence in the result of the trial, and he determined that there was a reasonable probability of a different result absent these errors. So we thought they'd have to do the whole thing all over again. We're here today because the Wisconsin Court of Appeals unreasonably reversed that determination. And I think what would be most useful, although I'm happy to answer questions about deficient performance, would be to talk about what the trial would have looked like without the errors and also what it looked like because of the errors. Because I think the key problem here is the cumulative prejudice analysis that the Wisconsin Court of Appeals performed when it said in a conclusory fashion that even given the totality of the errors, there would not be a reasonable probability of a different result here. So without the errors, this is what the trial looks like. Essentially four points. First, the case is based primarily on the testimony of two accomplices. But they have motives to implicate Mr. Cook, and they're very close with David Hall, who is the person that Mr. Cook believes was the second intruder here. Second, the jury actually would have learned about David Hall, who would have been there to testify. It knew a little bit about his strong connections with the accomplices absent the errors, but it would have learned that he had a gun resembling the gun used in the crime. And also that he was present in town on the night of the crime. He'd been there for about a month or two. And that in fact he had helped case the Harper residence, which is the scene of the crime. The jury did learn about certain purported admissions that Mr. Cook had made in speaking with police, namely that he was in town that night. Of course, that didn't distinguish Mr. Cook from David Hall. And what trial counsel Langan allowed to come in was this invocation of Mr. Cook's right to silence, which of course is suggestive of consciousness of guilt. So Mr. Ryder-Langman, let me ask you this. Obviously under 2254 and a long line of Supreme Court cases, our obligation is to defer to the last state court opinion, which is the Wisconsin Court of Appeals opinion that you're attacking. So it would actually be helpful for me if you could focus on either legal errors in applying the Supreme Court's law, I don't know whether it's a contrary to or it's an unreasonable application of situation. So one of the things I wondered, let's take the failure to track down Mr. Hall. Am I correct that the lawyer, what's his name, Mr. Langan, didn't undertake much of an investigation of where Hall was? There were a lot of steps he could have taken, but he in fact didn't. That's right, Chief Judge. He basically did nothing. In fact, he asserted to the trial judge at the time of trial when the judge was concerned that there had been no steps taken, that Hall was in prison. Of course, Hall was not in prison. But as far as we know, he was just assuming, I'm thinking of cases like Strickland itself, I'm thinking of Wiggins v. Smith, I'm thinking of other cases where the Supreme Court has said if a responsible lawyer would have undertaken an investigation, it's deficient performance to fail to do that, and of course then you would move to the prejudice issue when you're absence undermines confidence in the verdict. That's exactly right. So when you're looking at the reasonableness of an investigation, you . . . No, but the Wisconsin Court of Appeals seems to be saying, oh, Hall wouldn't have made any difference anyway, but it's not . . . I'm not sure whether they're conceding that it was deficient performance to fail to follow up on Hall, and we do have the post-conviction testimony from Hall himself that maybe he would have come. I don't . . . I think the court, with respect to Hall, the Wisconsin Court of Appeals is making a determination both on deficient performance and on prejudice. But what it's doing on deficient performance is it's saying it wouldn't be unreasonable to believe that Hall likely would not have shown up or that he would have refused to testify. But you have to try . . . I thought . . . I read from the other Supreme Court decisions that you have to investigate. No, that's . . . I completely agree, Your Honor. That's exactly the problem here. And prejudice, of course, is evaluated with the benefit of hindsight. The deficient performance is not. And here, if you actually look at what the Wisconsin Court of Appeals did, is it said, well, we know what happened and how helpful it might or might not have been, and he was on absconder status and these other things. Of course, Langen knew none of those things. He performed no investigation whatsoever, and he had a duty under Strickland to perform an investigation. So he didn't even take the initial step to do that. So to make this hypothetical conclusion about what counsel might have found is just unreasonable. But that doesn't . . . but you still . . . so your argument has to be, though, that the Wisconsin Court of Appeals unreasonably applied the prejudice prong, too. That's correct, Your Honor. Right. Because regardless of deficient performance, you have to show prejudice under Strickland. That's right, Your Honor. And actually, on . . . and the reason I wanted to move to prejudice is simply that there are also several issues on which the Wisconsin Court of Appeals does not make a deficient  So one of . . . and the primary one is this hearsay about the tower pings from the cell phone. They don't even address that. They don't address, also, for example, the failure of Langen to recross-examine one of the two accomplices about this gun that Hall might have had the night of the crime. And they just move right into prejudice. But to go back to Chief Judge Wood's question about don't we have to apply epidefference, yes, the court has to apply epidefference to the cumulative prejudice analysis. But as the court has found in other cases, when you're doing that, you can't allow the Wisconsin Court of Appeals to take a divide-and-conquer approach. And if you look at the determination they made on prejudice for each of these errors, they looked at many of them and they said, well, this . . . they either said it made a conclusory statement, such as this error doesn't undermine our confidence in the result, or they said, with respect to the hearsay, which I think is a good example, this wasn't the most damning evidence against Mr. Cook. We also have the testimony of the accomplices, and we have these admissions that Cook made. But when it's chalking those up, it's not actually considering the other errors that infected those particular pieces. So the testimony of the accomplices, the failure to bring out at least some understanding on their part that there would be lenience. That's right, Your Honor. So there's a little bit of more equivocal testimony from Ashley Sadowski on cross-examination between Sadowski and defense counsel. This is, of course, at the trial judge's prompting. And this happens first outside the presence of the jury, because the judge says, hey, what are you doing? Like, don't you want to bring out this potential motive of the witnesses to lie? So could I ask you, the Wisconsin Court of Appeals thinks that that aspect of things isn't a problem because, in fact, there was no formal immunity agreement. I think everybody, it doesn't seem to me that there can be any doubt about that. There is no formal immunity agreement. Is your point that if these witnesses were testifying under the understanding that there was going to be lenience, no prosecution, that that itself should have been brought out? That's exactly right, Your Honor. I mean, at the end of the day, I don't think it really matters whether there's a formal agreement if you have witnesses who are laboring under the impression that they won't be charged for providing this testimony. And so even though Langen brought a little bit of this out, what he didn't do was he didn't put this much less equivocal cross-examination that he conducted outside the jury's presence with Babbitt before the jury, where she basically says, yes, someone told me that I won't be charged if I testify here. And add to that the fact that we know that both of these accomplices are actually friends with David Hall, and that comes out more clearly when David Hall shows up to testify at the post-conviction hearing. And all that Langen needed to do was create a reasonable doubt that Cook was the second intruder. He did have an uphill battle on the evidence, though. I mean, he's got the two, Babbitt and, what's the other one's name, Sadowski? Sadowski identified, what's it, Ergeson and... Eggerson. Eggerson and your client right away afterward. They identified him in court. You got Margaret Harper, right, who, I mean, that testimony's a little odd, but she nonetheless identified him in court. You've got the defendant's DNA in the getaway car. I know you have an explanation for that or, you know, before. And then you have the defendant saying he's with Babbitt the night before, and he admits to being in the Walmart parking lot. I mean, it's not an insignificant prejudice hurdle. I mean, I think you've done a terrific job on the deficient performance, but you got a hurdle on the prejudice aspect of it. So Your Honor, I want to make two lines of responses. The first is that we just need to make sure we're asking the right questions. So the argument here has nothing to do with whether that evidence was sufficient to convict Mr. Cook. It's just whether trial counsel Alf Langen, had he made these objections that he performed properly could have helped the jury find reasonable doubt. Yeah, but we've got to conclude it would have undermined confidence in the outcome. I think that's right, but another thing Your Honor said, for example, this testimony of Margaret Harper, I mean, that's also the subject of another error on trial counsel's part. And actually, if you look at what the crux of the state's case was the testimony of these two accomplices, they had motives to lie. That's the argument. They were lying about this. Okay, so whatever you think of the reliability of the identification. The problem with Mrs. Harper's identification is she doesn't have the same type of motivations or same relationships with Mr. Cook that those accomplices did, or the same relationship with David Hall that those accomplices did. And this is an incredibly unreliable testimony. It's very suggestive for all the reasons we've pointed out in the brief. And all of a sudden, although she's been unable to identify the intruder in two photo arrays, all of a sudden she thinks she can identify him once she sees him in the courtroom, basically at the defense table. Okay, I think you'll, I'll give you a minute to rebut afterwards, and if Mr. O'Brien needs a little bit more, he's welcome to it. Thank you. Thank you. Mr. O'Brien. May it please the Court.  This is deficient, but I think we can focus on the prejudice side of things. Certainly the very able Wisconsin trial judge found a lot of problems with it. He found a lot of problems, but he didn't focus sharply on the question of prejudice. He said, he cited the Strickland standard perfectly. He actually, to a T, because prejudice isn't, would you win? Prejudice is, is your confidence in the verdict undermined, which we have, which the Supreme Court, never mind what we've said, it's unimportant, but which the Supreme Court has said certainly doesn't mean a 51% chance. It's way less than that. No. And yet, we focus on whether counsel's performance was reasonably competent. And you can, we can agree that counsel could have done a few things differently. The district judge found some areas where he was deficient, but also areas where he was not deficient. But Mr. O'Brien, I'm mystified that you want to dig in on the performance side of things. Well, the only thing, Mr. Cook argues, look at the cumulative errors, look at the cumulative, look at how it all adds up. And I think when we look at counsel's performance, we have to look at his overall performance, not every error, because errors occur at every trial. Right. But what he's attacking is the performance and how it affected the testimony of the key witnesses, Sadowski and Babik, and also this last minute courtroom, you have eyes, I remember, identification of one of the victims, and also the cell tower pings, and also, you know, the other. Well, first of all, the eyewitness identification testimony was admissible at the time of trial. Counsel had no basis to object to it. He had every basis to object on a 403 type, which Wisconsin has had for a long time. The Hibble case that said that was decided five months after the trial. But there are plenty of cases that suggest that Wisconsin courts for many years have had the authority to monitor evidence that is relevant but terribly prejudicial. I would ask the court to look at the Hibble decision, paragraph 36, where the Supreme Court said, up until now, Marshall basically was the beginning and the end of the inquiry. And paragraph 53, which says generally, constitutionally admissible surprise identifications like this one are to be admitted and submitted to the jury and not excluded. They can be under 90403, as we now hold. So yes, generally, evidence can be excluded under 90403. That was always true. But with respect to this precise situation. Yeah, that's what I mean. But put it aside, this precise situation, you still have the failure to cross-examine the witnesses who had promises of leniency. You still had the failure to object to the cell phone records, which the government couldn't authenticate. But again, the counsel did establish through Babbitt that she wasn't charged. It was undisputed that neither of these women were charged. Not in front of the jury in this way. And the cell phone towers, the government or the state failed to list any witness from the companies that operated these things. It couldn't have gotten these records in. The trial judge is absolutely clear about that and the Wisconsin Court of Appeals does not disagree. So how are you here? Is the Wisconsin Court of Appeals wrong too? No, but again, we also had testimony from both the women at the scene that Cook gave them a cell phone and they used it. They were called as soon as the robbery ended. And we also have testimony through Cook's girlfriend that she in fact got him a cell phone. So really, the important... That's different though than seeing the 4 a.m. cell phone record with the call and the women that you're talking about were those who, at least one of whom, wasn't cross-examined in front of the jury in a way that would show her potential bias. That's right. So why do we think that they aren't lying? I mean, the story that doesn't come out is the alternative story about the phone. Counsel established through both of them that they lied to police when they were initially   So they're liars. And there would have been even more evidence that they were liars. There could have been more, yes. And they wanted to hang this on Cook instead of Hall. Yes. And with regard to the absence of Hall, that really benefited Mr. Cook because as often happens with defense attorneys, they put an absent person on trial. And assuming Hall had some involvement in this, it benefited him to say, look, the state didn't bring in Hall, we don't have Hall's DNA, we do have his photograph and he looks very much like Mr. Cook, and he presents that to the jury. So these women are covering for Mr. Hall. That all came out at trial. But again, I... And I'll tell you, I'm confused about it, is exactly what statements the defendant made to the police. I'm focused on the second interview. And the second interview... And then specifically what was in front of the jury. And so in your brief on page 22 and 23, you say, in his statement to the police, Cook denied any involvement in the home invasion, but admitted he was at Babbock's house with her, Sadowski and Eggerson, beforehand. He admitted he was in the Walmart parking lot, etc., when they went in to purchase the gloves and the bandanas. And then you say, he admitted he left the next day with Eggerson, did not tell the police Hall was involved. And then you have a series of citations, and those citations appear in two other places in the brief. I've tracked every one of them down, and it's not clear to me that that's what he said to the police. What's clear to me from the trial transcript only comes on two pages. It comes on special appendix page 233 and 234. And this is all I can see that's in the trial record as to the statements of the defendant. It comes through an examination of the detective, where the detective is asked, isn't it true that before approximately 45 minutes or so, this kind of interrogation, he, the defendant, finally said to you, okay, I was in the Walmart parking lot, or words to that effect. Answer, I believe so. All right, then did he admit going to Walmart? No. Did he admit going to the Harper's home? No, is the answer. Did he admit to doing anything other than being at the Walmart parking lot? And here the detective seems to backtrack. What I recall he admitted to being, I don't know if he named her again, but at Babbock's house. Now, that's the entirety in the whole trial transcript that I can find of the defendant's statements, notwithstanding what you represent in the brief. Have I read it wrong? Okay, if that's what the record site shows, I guess I was, if that's true, I guess I was misled by the officer. Well, that's my question to you. Is it accurate or inaccurate? I mean, there's a lot that hangs in the balance for this gentleman. I think what he specifically admitted to was that he was with them before the robbery. Now, with regard to the Walmart, that he was at the house. Now, with regard to the Walmart, I thought that was also- Questions, what was in front of the jury? I'm sorry. What was in front of the jury as to the defendant's statements, and is it beyond what I just read? I will, I would assume not. And I might have misunderstood the undisputed point that he was at the house before they Now, the other witnesses all testified that he was at the Walmart. No question about that, but what I'm focused on, because it matters to me for the prejudice analysis, what did the defendant admit to the police? And without having that in front of me right now, I cannot say with 100% certainty that he said he was at the Walmart. If you would like, after the argument, in a day or so, to file a supplemental letter responding to this question, that might be the most efficient way to handle it. Sure. That would be fine. Please do that. Yeah. Again, you know, focusing on the prejudice component, that there is, it was reasonable for the Wisconsin Court of Appeals to conclude that there is no reasonable probability of a different outcome, even assuming deficient performance in some or all of the respects alleged in light of the strong evidence of the fact that Mr. Hall was present both before and after. You mean Mr. Cook? Mr. Cook was present both before and after his DNA was found in the getaway car. As was Mr. Hall's, by the way. No. I think so. Not in the getaway. No, Mr. Hall's DNA was never tested. So I see my red light's on, unless there are any further questions. I see none, so thank you. And Mr. Ryder-Longmead, I'll give you a minute to rebut. Judge Scudder, you asked where we might look in the record to see what Mr. Cook admitted to. If you look on Supplemental Appendix, page 242, you have a statement by Detective O'Neill about Mr. Cook admitting he was in the county that day, and he was at the girl's house, and then he went to Milwaukee after that. It's not as damning, I think, as the state suggests, and in any event, doesn't distinguish Mr. Cook from Mr. Hall, which is the point here. And I think, as Chief Judge Wood, you said, I don't believe Hall's DNA was tested, but of course, he also was in town at this time, and as all the information came out, both between the trial and the post-conviction hearing, and only the post-conviction hearing, I believe, that he had cased the Harper residence as well. So that's all. Being in Marinette County is a lot different than what's in the red brief. So is it your view? Is my summary, or my takeaway from what I read in the trial transcript, does that align with your memory? I think, Your Honor, it's at most equivocal about going to Walmart, and I think when we're talking about the Strickland inquiry here, which is, is there a reasonable probability of reasonable doubt this created in the jury's mind, and the jury's hearing this, and it's not super clear to them, and then what the detective actually says when it's further developed is, well, he admitted he was in town, and that's it, then I think you have to look at that and say, well, what effect also did this invocation of silence have? When you add up all these different things, I think you have to say, leaving aside the question, which is not the relevant question, whether the evidence was sufficient to convict, would all these errors, or if you didn't have these errors, would there be a reasonable probability of a different result, and I think that's the only reasonable conclusion here. Thank you. All right. Thanks to both counsel, and you were appointed to this case, Mr. Ryder-Longmaid, and we appreciate your assistance to your client and to the court, and the help of your firm as well.